UNITED STATES of America

v.

Dennis O. MILLER, Appellant.

No. 22332.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 1, 1969.

Decided March 23, 1970.

Reargued June 25, 1970.

On Rehearing March 19, 1971.

Mr. Steven John Fellman, Washington, D. C. (appointed by this court) for appellant.

Mr. John G. Gill, Jr., Asst. U. S. Atty. with whom Messrs. Thomas A. Flannery, U. S. Atty., and Roger E. Zuckerman, Asst. U. S. Atty., were on the brief, for appellee. Messrs. David G. Bress, U. S. Atty., at the time the record was filed, and John A. Terry, Asst. U. S. Atty., also entered an appearance for appellee.

Before BAZELON, Chief Judge, WILBUR K. MILLER, Senior Circuit Judge and MacKINNON, Circuit Judge.

BAZELON, Chief Judge:

About 12:30 p. m. on November 14, 1967, a man walked into Burdette's Wine & Liquors in the 5900 block of Georgia Avenue and asked for a fifth of Teachers Scotch. When the bottle was brought to him, he pulled a gun and demanded the money from the cash register; the money was given to him. He then took cash from the two owners of the store, Norman Goldberg and Benjamin Monfried, and from their employee, Leon Jones, and herded the three into a walk-in refrigerator. When they emerged a minute or so later, the Scotch and the robber were gone.

Goldberg called the police, and a lookout was broadcast over the police radio. Officer Alfred Innocenti, patrolling on foot in the 5500 block of Georgia Avenue, first received a call that a robbery was "in progress" at Burdette's. At that time he saw a moustachioed black man carrying a brown paper bag and running in a direction opposite to that in which the store lay. Innocenti then received a description of the robber—a "Negro male, six feet, 175 pounds and about 30 years of age, wearing a dark coat, a dark small brim hat, with a moustache," and carrying a whiskey bot-

tle. Innocent radioed that he had a suspect in sight, and followed the man, who had by then slowed his pace to a walk. He lost sight of him briefly and inquired of a number of persons on the street, who directed him to the rear of 5503 Georgia Avenue. Innocenti radioed for assistance, and he and two other officers entered the building. The proprietor of a tailor shop on the first floor told them that a man had just gone upstairs to the office of Dr. Roberts, a dentist. The officers knocked on the door of the office, identified themselves, and demanded entry. After an initial refusal, they were admitted by appellant, who was in his shirtsleeves and "breathing heavily." A dark coat and hat lay on a couch near the door.

The record is less than luminously clear regarding subsequent events. It appears, however, that the officers' first action upon entering the suite was to ask appellant where he had been for the past five minutes.[1] More policemen arrived. Some of the officers looked through the entire five-room office; they found a bottle of Teachers Scotch in a brown paper bag on a shelf.[2] At some point, the officers became aware that a young woman, later identified as appellant's sister, was also in the offices. Leon Jones was brought to the suite and asked if he could identify appellant; he could not. Benjamin Monfried was then brought over and identified appellant as the robber; appellant was shortly thereafter taken to the police station. After his departure, his sister gave the police some $28.00 which, she said, her brother had given her. She also pointed out a drawer in Dr. Roberts' own desk in which she said appellant had placed an "object" wrapped in rags. The police opened the drawer[3] and removed the "object," a gun belonging to Dr. Roberts. They subsequently left the office.

---

1. Appellant's answer to the question was not related to the jury at trial.

2. The bottle was later identified as having come from Burdette's by the license stamp on its label.

3. It is not clear whether or not the drawer was locked.

Appellant was tried in May of 1968 on five counts of robbery, eight counts of assault with a deadly weapon, and one count of carrying a dangerous weapon, the charges arising out of the robbery of Burdette's and two other robberies of liquor stores in the same area. Convicted on all counts, he was sentenced to concurrent terms of imprisonment, the longest being five to fifteen years. On this appeal, he presses numerous contentions relating to joinder of the offenses for trial, pre-trial identifications, and the scope of the search in Dr. Roberts' office. For the reasons hereafter stated, we find that there was no error in the admission of the fruits of the search; that Monfried's identification of appellant at Dr. Roberts' office was not made in impermissibly suggestive circumstances; that use of a second identification, even if tainted, was harmless beyond a reasonable doubt; and that failure to sever, if error, did not prejudice appellant on those counts arising out of the Burdette's robbery. Consequently we affirm those convictions. Since the sentences are concurrent on all counts, we may therefore dispose of the remaining charges without reaching the points raised by appellant.

I.

We note at the outset that appellant does not question the authority of the police in the circumstances to enter Dr. Roberts' offices in order to make the arrest. He argues instead that the bottle of Scotch and the gun, introduced into evidence against him, were the fruits of a search unlawfully broad in scope, and should therefore have been suppressed. Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

 Appellant, however, has no standing to challenge the search that produced Dr. Roberts' gun. "The established principle is that suppression of the product of a Fourth Amendment violation can be successfully urged only by those whose rights were violated by the search itself, not by those who are aggrieved solely by the introduction of damaging evidence." Alderman v. United States, 394 U.S. 165, 171–172, 89 S.Ct. 961, 965, 22 L.Ed.2d 176 (1969). Of course, as a person lawfully on the premises, appellant has standing to challenge the officers' entry into the suite itself. Jones v. United States, 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). But appellant's own testimony establishes that he had no authority to open or use the drawer in which the gun was found, nor is there any suggestion that the gun itself belonged to him. Consequently, even if the search or seizure of the gun were unlawful, appellant has not established that "he himself was the victim of an invasion of privacy." Jones v. United States, *supra*, at 261, 80 S.Ct. at 731.

 Authorized to use the laboratory in which the bottle of whiskey was found, appellant has standing to challenge its introduction into evidence. We believe, however, that the action of the police in seizing the bottle was lawful. They had entered the suite of offices in hot pursuit of an armed and fleeing felon. Although the man they sought was in view from the moment the door was opened, they had no way of knowing who else might be on the premises. In those circumstances, the police could justifiably conduct a search of the suite to assure themselves that no hostile and possibly dangerous persons were hiding in the other rooms. Warden Md. Penitentiary v. Hayden, 387 U.S. 294, 299, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).[4] The bottle of whiskey itself was in plain view in the dentist's laboratory,[5] and there is no evidence in this record that the police engaged in any general search of the premises beyond that necessary to find any other persons

4. The police did in fact turn up one other person in the suite, a young woman later identified as appellant's sister.

5. Although the record is not clear on this point, it may well be that the bottle was first seen from the waiting room into which the police initially entered.

who might have been in the suite.[6] *See* Stanley v. Georgia, 394 U.S. 557, 570–572, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (opinion of Mr. Justice Stewart). Seizure of the bottle and its subsequent admission into evidence were therefore proper.

■ We do not believe that the doctrine of pursuit, as reflected above, is affected by Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), assuming that case is applicable here,[7] *Chimel* dealt with the extent to which the mere fact of an arrest authorized a search as incident thereto. But Warden, Md. Penitentiary v. Hayden, *supra*, makes clear that the present search is not properly characterized simply as incident to appellant's arrest.[8] Rather, it falls within one of the "few specifically established and well-delineated exceptions"[9] to the requirement that judicial approval be obtained before police undertake a search. Consequently, the specific limitations established in *Chimel*[10] are not applicable to the present situation, and we find nothing in the rationale underlying *Chimel*—that "[t]he scope of [a] search must be

'strictly tied to and justified by" the circumstances which rendered its initiation permissible"[11]—inconsistent with our decision today.

## II.

Appellant was identified at trial by Benjamin Monfried and Norman Goldberg, co-owners of Burdette's Wine & Liquors. Each had observed the robber for several minutes during the holdup.[12] Government counsel on direct examination brought out that Monfried, shortly after the robbery, was taken by police to Dr. Roberts' office, where he identified appellant. Defense counsel elicited from Goldberg that he had previously identified appellant at his hearing before a United States Commissioner, a week after the offense.[13] Appellant argues that both these pretrial confrontations were improper. We find no illegality in Monfried's identification and affirm on that basis.

■ "The presentation of only one suspect, in the custody of the police, raises problems of suggestibility that bring us to the threshold of an issue of fairness." Wise v. United States, 127 U.S.App.D.C.

6. The officers did open Dr. Roberts' desk drawer to seize the gun, but apparently did so only after they had been told by appellant's sister that the gun was there. In any event, we have already concluded that appellant has no standing to challenge that portion of the search.

7. In view of the disposition we reach here, we express no opinion regarding the retroactivity *vel non* of *Chimel*. Von Cleef v. New Jersey, 395 U.S. 814, 89 S.Ct. 2051, 23 L.Ed.2d 728 (1969).

8. The Court in Warden, Md. Penitentiary v. Hayden carefully distinguished the situation with which it was dealing from that in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947), which like *Chimel* (by which it was overruled, 395 U.S. at 768, 89 S.Ct. 2034) dealt with the lawful scope of a search incident to an arrest. *See* Warden, Md. Penitentiary v. Hayden, 387 U.S. at 299, 87 S.Ct. 1642.

9. Katz v. United States, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), citing Warden, Md. Penitentiary v. Hayden as one of the exceptions. *Id.* n. 19.

This portion of *Katz* was specifically reaffirmed in *Chimel*. 395 U.S. at 763 n. 8, 89 S.Ct. 2034.

10. *See* 395 U.S. at 762–763, 89 S.Ct. 2034.

11. Chimel v. California, *supra*, at 762, 89 S.Ct. at 2039; brackets and quotation marks have been omitted. The Court in *Chimel* was quoting Terry v. Ohio, 392 U.S. 1, 19, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), which quoted in turn from Mr. Justice Fortas' concurring opinion in Warden, Md. Penitentiary v. Hayden, *supra*, at 310, 87 S.Ct. 1642.

12. Goldberg testified that he observed the robber closely because he resembled a man who had previously passed a rubber check in the store. Monfried, although certain of his identification, admitted that "I was looking more at the gun than I was at him."

13. Goldberg was seated among the spectators for some time and appears to have identified appellant when the latter entered the room. Goldberg was later called as a witness and then identified appellant from the witness stand.

279, 282, 383 F.2d 206, 209 (1967). Yet prompt identifications seem to be more reliable than stale ones; and by bringing a suspect before witnesses within moments of the crime, the police may be able to release an innocent man apprehended in error, and begin again the search for the perpetrator of the crime. See Simmons v. United States, 390 U.S. 377, 384–385, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). These considerations led us to conclude that notwithstanding United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), the absence of counsel from an identification conducted immediately after the crime does not foreclose the government from use of that identification. Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280 (1969).[14]

■■ Nor do we believe that "the confrontation conducted in this case was so unnecessarily suggestive and conducive to irreparable misidentification" as to deprive appellant of due process of law. Stovall v. Denno, 388 U.S. 293, 301–302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 694 (1967). For "absent special elements of unfairness, prompt on-the-scene confrontations do not entail due process violations." Russell v. United States, 133 U.S.App.D.C. at 81, 408 F.2d at 1284. The only particular elements in this case upon which appellant premises his claim of unfairness are the presence of perhaps half a dozen police officers, and of appellant's sister, characterized (in appellant's brief) as having been at the time "hysterical." Without pausing to examine the accuracy of this characterization, we are able to conclude that the present identification was not made in impermissibly suggestive circumstances. Monfried was originally able to observe the robber for several minutes in a well-lit store at noontime.[15] Appellant when identified was in his shirtsleeves, whereas the robber had been wearing a coat, hat, and tie during the offense.[16] and finally, before Monfried's identification, a store employee had been brought by the police to Dr. Roberts' office, and had been unable to identify appellant. Under these circumstances, and in light of all the evidence, we find no violation of due process.

■ We therefore need not consider the applicability of United States v. York, 138 U.S.App.D.C. 197, 199, 426 F.2d 1191, 1193 (1969), and Mason v. United States, 134 U.S.App.D.C. 280, 414 F.2d 1176 (1969), to Goldberg's identification of appellant in the United States Commissioner's hearing; nor do we decide whether, if that confrontation was improper, this record provides a sufficient basis for us to conclude that Goldberg's in-court identification nevertheless was based on an independent source—that is, on his observation of the bandit during the holdup. We find, rather, that in the circumstances of this case, admission of Goldberg's identification, even if error, was harmless beyond a reasonable doubt. Appellant was seen by a police officer walking away from the store shortly aft-

---

14. Our conclusion in *Russell* was based on "a general rule that it is not improper for the police immediately to return a freshly apprehended suspect to the scene of the crime for identification by one who has seen the culprit minutes before." 133 U.S.App.D.C. at 81, 408 F.2d at 1284. We see no reason to reach a different conclusion where, as here, the witness is brought to the suspect. *Cf.* Jackson v. United States, 134 U.S.App.D.C. 18, 22–23, 412 F.2d 149, 153–154 (1969).

15. Compare the more limited opportunities for observation in Wise v. United States, 127 U.S.App.D.C. 279, 383 F.2d 206 (1967), and Russell v. United States, 133 U.S.App.D.C. 77, 408 F.2d 1280 (1969).

16. The police had found in the dentist's office a coat and hat matching the description of that worn by the robber. The point here is that, had they desired to force a positive identification of appellant, they presumably would have forced him to don these clothes. *See* Russell v. United States, 133 U.S.App.D.C. at 82, 408 F.2d at 1285:

Stovall v. Denno did not erect a due process barrier against all unreliable identifications; it requires exclusion only of evidence which could and should have been obtained by procedures less conducive to unreliability. [footnote omitted]

er the holdup. He was in view almost constantly from that time until he entered the dentist's office. The officer, arriving there within minutes, recognized appellant as the man he had been following. A coat, hat, and gun were found in the offices; all matched the description of those used by the robber. A bottle of whiskey which had come from the robbed store was also found there. Finally, appellant was legitimately identified, within minutes of the crime, by one of the victims. We cannot imagine a different result if Goldberg's testimony had been barred. Chapman v. California, 386 U.S. 18, 22–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

### III.

Appellant's final claims with respect to the robbery of Burdette's relate to joinder and severance. Fed.R.Crim.P. 8, 14; see Bradley v. United States, 136 U.S.App.D.C. 339, 420 F.2d 181 (1969). Evidence that appellant had committed the two other robberies with which he was charged was, as the government admits, far weaker than that relating to the robbery of Burdette's.[17] Although there may be cases in which this point would not be dispositive, in the present case it is clear to us that no prejudice inhered with regard to the counts growing out of the robbery of Burdette's. Accordingly, we affirm the convictions on these counts.[18]

Finally, appellant presents a raft of claims relating to his conviction on charges arising out of the other robberies. Although all of his sentences are to run concurrently, the validity of the concurrent sentence doctrine is presently in serious doubt. Benton v. Maryland, 385 U.S. 784, 787–793, especially

793, 89 S.Ct. 2056, 23 L.Ed.2d 707 n. 11 (1969). Were we to refuse to consider these claims, they might well be open on collateral attack on those convictions Street v. New York, 394 U.S. 576, 579–580, 89 S.Ct. 1354, 22 L.Ed.2d 572 n. 3 (1969); Carafas v. LaVallee, 391 U.S. 234, 237–238, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963). Yet the government professes no interest in upholding appellant's remaining convictions. Accordingly, we see no reason to burden either ourselves or the district court with complex litigation in the outcome of which only one party has a serious interest. United States v. Johnson, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943); California v. San Pablo & Tulare R.R., 149 U.S. 308, 13 S.Ct. 876, 37 L.Ed. 747 (1893); Hayburn's Case, 2 Dall. (U.S.) 409, 1 L.Ed. 436 (1792). We therefore enter judgment of affirmance of the sentences and judgments entered on counts eight through fourteen of the indictment, and vacate the remainder. See Kee v. United States, 135 U.S.App.D.C. 249, 418 F.2d 465 (1969); cf. Duke Power Co. v. Greenwood County, 299 U.S. 259, 267, 57 S.Ct. 202, 81 L.Ed. 178 (1936).

So ordered.

### On Rehearing

### PER CURIAM:

When the appeal in this case was originally argued we affirmed the conviction on those counts involving the robbery of Burdette's Liquor Store and vacated the convictions on the other counts because concurrent sentences had been adjudged and we concluded that the Government concurred in the dismissal of appellant's remaining convictions.[1] Subsequently

---

17. The evidence in each of the other cases consisted of the alleged similarity in carrying out the robberies—in each case, the bandit had prefaced his demand for money with a request for good Scotch, which he carried away—and on the testimony of eyewitnesses, who identified appellant and some of whom described the gun and coat seized after the Burdette's robbery as similar to that used in their robberies.

18. Counts 8, 9, 10, 11, 12, 13, and 14 of the indictment.

1. The Government's brief had argued that since all of appellant's sentences are to run concurrently that it was "unnecessary to consider claims arising from the Colony and Hamilton Liquor Stores robberies."

we granted the petition by the Government for rehearing with respect to appellant's convictions on the first seven counts that had been vacated and the matter was fully briefed and argued on rehearing.

■ At rehearing the Government pointed out that we misconstrued their reliance on Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), and that they had urged affirmance of the conviction on all fourteen counts because appellant had not met the burden of proving sufficient grounds for reversal. We have accordingly reviewed the vacated counts. They involve two separate robberies, committed at different times, rather than duplicate counts charging essentially the same robbery under separate District of Columbia and federal statutes as in United States v. Hooper, 139 U.S.App.D.C. 171, 432 F.2d 604 (1970). We agree with the Government that since they do involve separate armed robberies there exists a strong public interest in upholding such convictions so we have considered each of those counts on the merits. We now vacate that portion of our prior opinion vacating the convictions on the first seven counts of the indictment and affirm them.

■ The seven counts relate to the separate robberies of the Colony and Hamilton Liquor Stores. A number of the questions raised by appellant in this court with respect to these counts were disposed of in our decision affirming the convictions on the Burdette counts. In this category were some of the issues relating to the joinder of the offenses which we found to be proper under Fed. R.Crim.P. 8(a).

This Rule permits joinder of "two or more offenses * * * in the same indictment * * * if the offenses * * are of the same or similar character." Here, as the Government's brief characterized the similarities in these three offenses, there were:

(1) three robberies (2) of three liquor stores (3) within a ten block area on Georgia Avenue, N. W. (4) within 17 days (5) by an *unmasked* lone gunman, (6) weilding [*sic*] a small snub nosed gun; a man who was (7) neatly dressed (8) in dark clothes, (9) 6 foot tall (10) slender build, 170 lbs. (11) Negro, (12) medium dark complected (13) with a moustache; a man who (14) preceded each robbery by requesting a fifth of whiskey (15) which was always good scotch; (16) who only pulled his gun after the scotch was put in a bag and placed on the counter (17) who herded his victims into a back room and (18) who left taking his bottle of scotch. (Emphasis in original.)

These unique similarities satisfy the standards for joinder that we laid down in Drew v. United States, 118 U.S.App. D.C. 11, 16–20, 331 F.2d 85, 90–94 (1964). Evidence of each of the crimes was relevant to establishing a common scheme and plan that tended to establish the perpetrator of the other crimes and went to the issue of identity. The evidence as to each crime was also clearly separable and distinct and not likely to cause confusion or to be misused with respect to the other crimes. There was no showing at the trial or now that any prejudice resulted from the refusal to grant severance as permitted by Fed.R. Crim.P. 14, and so we hold that the joinder of the offenses of the three robberies was proper. The decision on such motion is one that is committed principally to the sound discretion of the trial court. Hill v. United States, 135 U.S. App.D.C. 233, 418 F.2d 449 (1968).

■ Appellant next contends that it was a denial of his rights, recognized in *Mallory*[2] and *Adams*,[3] to permit him to be viewed by victims of the Colony and Hamilton robberies for possible identifi-

2. *Mallory v. United States,* 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957).

3. *Adams v. United States,* 130 U.S.App. D.C. 203, 399 F.2d 574 (1968).

cation while he was in custody on the Burdette charge and before his present-ment for his preliminary hearing on that charge. However, we find there was no unnecessary delay between appellant's arrest and presentment and that adequate probable cause existed that he had committed the Hamilton and Colony robberies.

Appellant was arrested at about 1:05 P.M. on November 14, 1967 and was presented to the United States Commissioner for his preliminary hearing at 3:40 P. M. on the same day, *i.e.*, within two hours and thirty-five minutes of his arrest. He was then advised of his rights and the hearing was continued for one week to permit him to obtain a Legal Aid attorney. Between his arrest and present-ment he was viewed by several victims of the three robberies. This interval of two hours and thirty-five minutes is insufficient to constitute unnecessary delay and is far less than the period involved in *Adams*.[4] It is comparable to the two hours and twenty minutes which we upheld in the companion cases to *Adams*.[5] So those identifications were not made during a period of unnecessary delay in appellant's presentment and since probable cause existed for appellant's arrest on the Colony and Hamilton robberies because of the similarities in the three crimes, it was not improper to have the victims of those robberies view him promptly after his arrest.

In this connection, appellant contends with respect to the Colony and Hamilton robberies that the pretrial identification procedure that was followed with respect to Simmons, McGain, Press, Goldberg and Monfried were so unnecessarily suggestive as to constitute a deprivation of due process.

Simmons was one of the victims in the Hamilton robbery which occurred on October 28, 1967. At the trial he made an in-court identification of appellant in response to Government interrogation. On cross-examination counsel for appellant brought out that he had also identified appellant at the precinct police station on November 14th. This identification had occurred when Simmons walked by an open door in the police station and recognized appellant through the open door seated at a desk with his head down. Only one man was visible in the room. When he was back in the police car that brought him to the station the police asked if he had seen anyone in the station house and he said he had recognized appellant.

McGain was one of the victims of the Colony Liquor Store robbery which occurred on November 4, 1967. He made an in-court identification in response to Government questioning and later on cross-examination testified that he had recognized appellant at the precinct station under circumstances similar to Simmons' viewing. He had walked alone down a hallway and "saw him through the door." He was about 20 feet away. He testified, "I just happened to see him while I was up there," thus indicating, as did Simmons, that the police did not suggest the identification.

Press was also a victim of the Colony robbery. As a Government witness he made an in-court identification of appellant. On cross-examination appellant's counsel also brought out that he had identified appellant from a number of pictures and at the preliminary hearing [6] when he recognized him coming out of a door into the room. He had been asked to watch the door and two other Negro

<hr/>

4. *Supra* note 3. In *Adams* numerous suspects were arrested for one robbery at 1:40 P.M. and between 2 P.M. and 4 P.M. were placed in a series of lineups for viewing by victims of other crimes. Following such lineups, no presentment was held, and the next morning they were placed in another lineup at which they were identified as the participants in another robbery.

5. Stuckey and Roots v. United States, 130 U.S.App.D.C. 203, 399 F.2d 574, (affirmed by order March 11, 1968).

6. The preliminary hearing was held on November 21, 1967. The photographic identification was made from six photographs on November 14, 1967 after the Burdette robbery. On two prior occasions Press had examined 25 to 30 different pic-

men came out before he recognized appellant. Appellant was also represented by a Legal Aid attorney at this time.

■ The viewings by Simmons and McGain at the precinct station were improper but their in-court identification may be used if there is clear and convincing evidence that each witness had a reliable independent source for his testimony. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).[7] We find that both Simmons and McGain did have an independent source.

Simmons at the time of the robbery was working in the Hamilton Liquor Store and observed appellant from a distance of about six feet, took the money from the cash drawer and pursuant to appellant's order put it in a bag containing liquor. The lights in the store were on at the time. He observed and later gave an accurate description of appellant's build and complexion.

McGain was working in the Colony Liquor Store at the time of its robbery. He waited on appellant when he came in and ordered a fifth of Johnny Walker Red (whiskey). Thereafter appellant pointed a gun at him and told him to give him the money. The two men were across the counter from each other at the time, about four feet apart. McGain accurately described appellant and identified a coat admitted into evidence as looking "like the same coat he was wearing that night, the same color and everything." He also defended his in-court identification on May 24, 1968 (months after the robbery), saying he "could be may be * * * mistaken * * * but I don't think I am." In response to a question inquiring whether he could have

been mistaken at the police station identification on November 14, 1967, he testified, "No, no."

From the foregoing we conclude that both witnesses had excellent opportunities to observe the robber while the crime was in progress and that there was no attempt at suggestivity during the pretrial viewings. Both witnesses also evidenced a candor and fairness that carried conviction. Accordingly, we find these two witnesses had an independent source for their in-court identification. In addition we also determine that the entire record presents no substantial likelihood of irreparable misidentification.

In the Hamilton robbery in addition to Simmons' identification, another clerk made an in-court identification without testimony of any other identification having been made by him. This was Malone, the clerk who waited on the robber, viewed him while all the lights were on in the store and gave a good description of him. At trial, his identification was not challenged on cross-examination.

The Colony robbery also had a victim-witness who, without any pretrial viewing of appellant, identified him in court as the robber. This witness was Max Sommer, a co-owner of the Colony Liquor Store. He was in the store when the robbery occurred and the robber pointed the gun at him from a distance of 10 or 12 feet. At one time he was also as close to the gunman as three or four feet. Sommer also gave a description of the robber that coincided generally with other descriptions.

These latter identifications were all made under proper circumstances and preclude any "very substantial likelihood of irreparable misidentification." [8] The

---

tures and an unspecified number of pictures and had not recognized appellant in any of them. We find the photographic identification to have been made under proper conditions.

7. Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967) is inapplicable because the Government did not submit the pretrial identification as part of its case in chief. The pretrial

identifications were introduced by appellant through cross-examination of Government witnesses.

8. Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967); United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Clemons v. United States, 133 U.S.App.D.C. 27, 408 F.2d 1230 (en banc, 1968).

convictions on the first seven counts involving the Colony and Hamilton robberies are accordingly

*Affirmed.*

BAZELON, Chief Judge (dissenting):

We granted the government's petition for rehearing to consider its assertion that "it is most emphatically not true that 'the government professes no interest in upholding appellant's [vacated] convictions.'" At oral argument on rehearing government counsel mentioned, without elaboration, two possible interests in reinstating the vacated convictions: they would otherwise not be available for impeachment or for sentencing purposes in any future prosecution.[1] It would appear that the government's interest will arise only if rehabilitation efforts fail and appellant commits another crime. This contingency, it seems to me, does not suffice to justify the expenditure of judicial time and effort required to resolve the serious and difficult questions appellant has raised concerning the vacated convictions.[2] The expenditure of our resources seems particularly unwarranted in view of the government's statement in its supplemental brief that it

> fail[s] to see any appreciable difference in the collateral consequences of three simultaneous robbery convictions as opposed to just one.

For these reasons I would adhere to our original decision. As we recently had occasion to note in a similar situation:

> We see no reason to devote our time and energies to the research, and opinion-writing, incident to appropriate determination of [the difficult issues presented by all the convictions underlying the concurrent sentences] *when no present public interest or need is furthered thereby.* It better serves the general interest of the administration of justice if the court limits its resources to the determination of those

---

1. Other possible government interests in the vacated convictions may involve such matters as recidivist statutes, parole, and later successful collateral attack on the affirmed convictions. But it would be unwise to pursue such inquiries without the assistance of counsel. My own brief research indicates that the government's interest may be quite attenuated. Recidivist statutes become important only if appellant is convicted of another crime. And even then it is by no means clear whether the convictions presently before us will count as several or only one conviction for purposes of the recidivist statutes. *See* Benton v. Maryland, 395 U.S. 784, 790 & n. 6, 89 S.Ct. 2056, 23 L.Ed. 2d 707 (1969) and sources cited therein. As to parole, it appears that multiple convictions will not affect appellant's eligibility, *see* 18 U.S.C. § 4202 (1964); 28 C.F.R. § 2.3 (1970), but it is unclear whether the number of convictions is a factor—or how important a factor—in the parole board's decision to grant parole to an eligible prisoner, *see* 28 C.F.R. §§ 2.2, 2.14 (1970). And as to successful collateral attack on the convictions affirmed previously, I do not see how the government suffers any harm here that it did not also suffer in United States v. Hooper, 139 U.S.App.D.C. 171, 432 F.2d 604 (1970).

2. Appellant challenges, *inter alia*, three in-court identifications under United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967) and Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). With respect to the Hamilton Liquor Store robbery, appellant contends, and the government concedes, that his identfication by Simmons at a one man show-up at a precinct station six weeks after the offense was unlawful. Appellant also contends that there was no "clear and convincing evidence that the in-court identifications were based upon observations of the suspect other than the [unlawful] identification," United States v. Wade, *supra* 388 U.S. at 240, 87 S.Ct. at 1939, or at least that the case should be remanded for a hearing and findings by the trial judge as to independent source. With respect to the Colony Liquor Store robbery, the police displayed appellant to McGain in much the same way as they showed him to Simmons, and appellant raises the same challenges. Another witness to this robbery, Press, had two challenged pre-trial identifications: he was shown six pictures, including appellant's, about two weeks after the robbery; and then later he identified appellant at a preliminary hearing, after having been told by the police to see if he recognized anyone who walked through a certain door.

questions and cases that must be decided, especially in view of the ever-mounting docket that besets this and other appellate courts. (emphasis supplied)

United States v. Hooper, 139 U.S.App.D. C. 171, 173, 432 F.2d 604, 606 (1970); *see also* Kee v. United States, 135 U.S. App.D.C. 249, 418 F.2d 465 (1969); United States v. Henderson, 142 U.S.App.D. C. 21, 439 F.2d 531 (1970).